# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

DOROTHY PHILSON,        :
                                    :
      Plaintiff,             :
                                      :
      v.                     :        Civil Action No. 5:08-CV-155 (HL)
                                      :
HOSPITAL AUTHORITY OF       :
HOUSTON COUNTY, GEORGIA,   :
d/b/a HOUSTON MEDICAL      :
CENTER,                      :
                                      :
      Defendant.         :
_____

# ORDER

Before the Court is Defendant Hospital Authority of Houston County's Motion for Summary Judgment (Doc. 14). For the following reasons, Defendant's Motion is granted.

## I. FACTS AND PROCEDURAL HISTORY[1]

Plaintiff Dorothy Philson was employed by Defendant Hospital Authority of Houston County, d/b/a Houston Healthcare ("HHC"), as a registered nurse from August 10, 1981, until her termination in 2006. (SOMF ¶ 3; Pl. Dep. Ex. D-6).[2] Philson is a

---

[1]The Court views the facts in the light most favorable to Philson as the nonmoving party.

[2]"SOMF" refers to Defendant Hospital Authority of Houston County's Statement of Material Facts (Doc. 16). The cited paragraphs are those admitted by Philson in her response to the statement of facts.

black female.  (SOMF ¶ 1).  She graduated from Macon Junior College as a registered nurse in 1975, and became a certified legal nurse consultant in 2007.  (Pl. Dep. Vol. I, pp. 12-13).

In March, 2001, Philson worked in the HHC Behavioral Health Unit, also known as "1 West."  Patients with mental health and drug and alcohol abuse problems were treated in this unit.  Philson worked in 1 West until her termination.  (SOMF ¶ 6; Pl. Dep. Ex. D-13).

Burton Carriker became the HHC Director of Behavioral Health Services in November, 2004, and assumed oversight of 1 West.  (SOMF ¶¶ 7-8).  Tina Bradley and David McCarey, both of whom were nurse managers, were Carriker's immediate subordinates.  (SOMF ¶ 9).  Walter Schnedeker was an assistant nurse manager, and served as Philson's direct supervisor.  Bradley and McCarey also had supervisory responsibilities over Philson.  Carriker, McCarey, and Schnedeker are Caucasian males.  Bradley is a black female.

In April, 2005, Philson found herself shorthanded while at work, and asked Carriker for additional staffing assistance.  Carriker turned down Philson's request, but when two Caucasian nurses, Frances Bolen and Mary Brigmond, made similar requests, they were given additional assistance.  (Pl. Dep. Vol. I, pp. 107-108). Philson complained in an entry in the nurses' pass-along book that other nurses were not

helping her.  (SOMF ¶ 16; Pl. Dep. Ex. D-34).[3]  She felt like she was being treated differently than others in the hospital, specifically Bolen, Brigmond, and Kelly Crawford, all of whom are Caucasian.  (Pl. Dep. Vol. I, pp. 129-130).  Bradley, the nurse manager at this time, told Philson and noted on the entry that the pass-along book was not the appropriate forum to raise this issue.  (SOMF ¶ 17; Pl. Dep. Ex. D-34).

Also in April, 2005, Philson's schedule at HHC was adjusted at her request.  She began working 24 hours each weekend (7:00 p.m. to 7:00 a.m. Saturdays and Sundays), and was paid as if she worked 32 hours.  (SOMF ¶ 13; Pl. Dep. Ex. D-32 and D-33).  She worked at Robins Air Force Base the remainder of the week.  (SOMF ¶ 15).  On May 11, 2005, Philson was issued a Corrective Action/Disciplinary Report terminating her employment for being a "No Call/No Show" for her scheduled shift on May 7 and 8, 2005, a Saturday and Sunday.  (Pl. Dep. Ex. D-37).   The disciplinary action was initiated by Bradley, and the report was signed by Bradley, Carriker, and Gloria Bond, who was with Human Resources.  (SOMF ¶¶ 19, 21; Pl. Dep. Ex. D-37).  Philson disputed the allegation that she did not call to notify the hospital that she would not be there on the days in question, as she called another supervisor, Kathy Shiplett, and told her she was sick and had just been released from the hospital.  (Pl. Dep. Vol. II, p. 54; Pl. Decl., ¶¶ 18, 22).  She filed an appeal of the disciplinary action on May 11,

---

[3]The pass-along book is a book where nurses identify problems they want to call to the nurse manager's attention, and where nurse managers inform nurses of matters about which they need to be aware.  (Pl. Dep. Vol. I, p. 129).

2005.  (Pl. Dep. Ex. D-38). In Philson's opinion, this disciplinary action was taken by Carriker because of her complaints about the unequal staff assistance and his wrongful racial discrimination against her.  (Pl. Dep. Vol. I, p. 157, Vol. II, p. 48).  The appeal documents filed by Philson stated that there had been a wrongful termination without any justification, but made no mention of discrimination based on race or sex.  (Pl. Dep. Ex. D-39 and D-40).[4]

Philson initiated the next level of the appeal process on May 13, 2005.  This appeal went to David Campbell, Executive Director of Physician Services.  (Pl. Dep. Ex. D-41).  Campbell was Carriker's supervisor, and answered to the Chief Executive Officer of HHC.  (SOMF ¶ 27).  It was Campbell's responsibility to review disciplinary actions when they reached the appeal level.  (Campbell Dep., p. 8).  The documents filed by Philson related to the second appeal again made no mention of discrimination. (Pl. Dep. Ex. D-41 and D-42).

After the second appeal was denied, Philson appealed the action to Jeanne Hoag, Director of Nursing.  (Pl. Dep. Ex. D-46).  While the June 29, 2005 appeal document submitted to Hoag made no mention of discrimination, Philson told Hoag around that time that she felt she was being discriminated against.  (Pl. Dep. Vol. I, p. 157).  In a subsequent meeting on July 6, 2005, Philson presented information to Hoag

---

[4]While Philson used the term "grievance" in her deposition when discussing documents related to the 2005 termination, the documents themselves refer to an appeal of her termination.

and Gloria Bond regarding the disciplinary action.  (SOMF ¶ 32; Pl. Dep. Ex. D-58).

Philson was subsequently reinstated to her position.  (Pl. Dep. Ex. D-58).  She did not

file a charge with the Equal Employment Opportunity Commission ("EEOC") regarding

the 2005 disciplinary action.  (SOMF ¶ 38).  She did, however, make complaints to her

supervisor and others that she was being treated differently because she was black.

(Pl. Dep. Vol. II, pp. 140-141, 143).

As a healthcare facility, HHC is inspected by the Joint Commission on

Accreditation of Healthcare Organization ("JCAHO").  An independent agency provided

consultants to help HHC prepare for the 2006 inspections.  (SOMF ¶ 40).  HHC also

began an education campaign regarding the use of abbreviations in medical records

as preparation for an upcoming JCAHO survey.  (SOMF ¶ 41).  Two preliminary

inspections were conducted at HHC by the consultants, and a JCAHO readiness punch

list was created.  (SOMF ¶ 42).  The punch list, dated March and April, 2006,

specifically stated:  "Do not use abbreviations:  QD was frequently found used within

the medical record," and "All elements of all forms must be completely filled out."  (Pl.

Dep. Ex. D-67).  While copies of the punch list were distributed to the staff, Philson

contends that the punch list she received did not contain the information about the use

of "QD," which is the abbreviation for "Daily."  (Pl. Dep. Vol. II, pp. 22-23).

On March 8, 2006, a memorandum was issued to all 1 West nurses regarding

a JCAHO Patient Tracer Survey 1 West unit meeting to be held on March 25, 2006.

(SOMF ¶ 43; Pl. Dep. Ex. D-64).  Philson believed the purpose of the meeting was to

talk about what JCAHO would be looking for during the inspection.  (SOMF ¶ 44). According to the minutes from the staff meeting, Philson was absent without an excuse. One issue addressed at the meeting was the use of approved abbreviations versus unapproved abbreviations.  (Pl. Dep. Ex. D-65).  Philson contends that she discussed the meeting topics later with Walter Schnedeker, but he did not discuss the abbreviation issue with her.  (Pl. Dep. Vol. I, pp. 19-20).  Philson also contends that she was the only nurse who was not told about the abbreviation matter.  (Pl. Dep. Vol. II, p. 46).

On May 1, 2006, Philson received a Corrective Action/Disciplinary Report in the nature of a written warning for use of unapproved abbreviations in patient charts and an incomplete nursing assessment.  (SOMF ¶ 48; Pl. Dep. Ex. D-71).  Philson was familiar with HHC's Order Writing Guidelines, as well as a list of "do not use" abbreviations posted in the hospital and on the units.  (SOMF ¶¶ 45-47; Pl. Dep. Ex. D-68, D-69, and D-96).  McCarey, who was then one of Philson's supervisors, initiated the written warning, which was presented to Philson by McCarey and Carriker.  (SOMF ¶¶ 50-51; Pl. Dep. Ex. D-71).

When Philson received the written warning from McCarey on May 1, 2006, he showed her a record he had prepared on one of her patients and pointed out the problems with the nursing assessment.  This was done in a supervisory capacity to show her what she had done incorrectly.  (SOMF ¶¶ 56-59).  Philson admittedly did not complete the nursing assessment and wrote "QD" twice on an assessment sheet,

instead of "Daily."  (SOMF ¶ 60; Pl. Dep. Vol. II, p. 49; Pl. Dep. Ex. D-96).  Philson also received a Work Improvement Plan from McCarey that same day.  (SOMF ¶ 61; Pl. Dep. Ex. D-72).  She tried to explain to McCarey that there were times when nursing assessments could not be completed immediately and that there was a standard policy allowing nurses up to eight hours to complete the assessments, but her argument made no difference.  (Pl. Dep. Vol. I, p. 97).[5]  Philson believed there was nothing wrong with using "QD" on nursing assessments, only on the patients' charts, as the original "do not use" notice posted on the unit only referred to the non-use of "QD" for doctor's orders. (Pl. Dep. Vol. II, pp. 34, 41-42, 44).  According to Philson, other nurses used "QD" but were not written up for it.  (Pl. Dep. Vol. II, p. 35; Pl. Decl., ¶ 9).  On May 16, 2006, McCarey issued a memo to the 1 West staff requesting that the staff be "hypervigilant" in the use of abbreviations.  This memo specifically stated that unapproved abbreviations were not to be used at all, including in assessments and histories.  (Pl. Dep. Ex. D-74).

Under HHC's Employee Corrective Action/Disciplinary Policy, an employee who receives a written warning is not eligible for pay increases, bonuses, or job transfers during the period the warning is in effect, which is 180 days.  If no other incidents occur during the 180-day period, the warning becomes inactive for the purpose of pay

---

[5]"The comprehensive nursing assessment will be completed by a qualified Registered Nurse within eight (8) hours of admission to determine the immediate needs, problems and safety of the patient."  (Pl. Dep. Ex. D-118).

increases.  (SOMF ¶ 52; Pl. Dep. Ex. D-119).  Bonuses are generally awarded during the month of February.  (SOMF ¶ 53).  Employee performance evaluations are done on an annual basis, at which time an employee may be eligible to receive a merit-based pay increase.  (SOMF ¶ 54).  Employees who are already being paid over the maximum hourly rate for their position are not eligible for raises, but may be entitled to a cash bonus.  (SOMF ¶ 55).  As of May 1, 2006, Philson was being paid $30.91 per hour, and the maximum hourly rate for her position during 2006 was $30.53 per hour.  (SOMF ¶ 55).

Philson appealed the written warning to McCarey, Carriker, Jeanne Hoag, David Campbell, and Human Resources on May 2, 2006.  (SOMF ¶ 63; Pl. Dep. Ex. D-73). In the appeal document, Philson alleged that the written warning was retaliation because she was reinstated to her job in 2005 and because of her age and race.  (Pl. Dep. Ex. D-73).  There was no mention of sex discrimination.  (Pl. Dep. Vol. II, pp. 48-49).  During this time period, Philson also told Carriker that she was being treated differently and that she was being discriminated against because of her color.  (Pl. Dep. Vol. II, pp. 48, 54).

Philson met with Carriker and McCarey on May 9, 2006 to discuss her appeal of the written warning.  (SOMF ¶ 71; Pl. Dep. Ex. D-87).  This initial appeal was denied on May 10, 2006.  (SOMF ¶ 72).  In preparation for a subsequent appeal meeting with management, Philson copied several patient records from 1 West patients' charts. According to Philson, this was done to show that Caucasian nurses in the ward

8

completed assessments in the same manner she did. (Pl. Dep. Vol. I, pp. 99-100; Pl. Decl., ¶¶ 9-12). Philson asserts that she blacked out all identifying information from the records and also tore names off of the pages. (Pl. Dep. Vol. I, pp. 98-100; Pl. Decl., ¶¶ 4, 9). She did not tell anyone with HHC that she was going to copy the records and did not get permission from the patients whose charts she copied. (SOMF ¶¶ 76-77). Philson produced these patient records during a meeting with Carriker, McCarey, and Linda Watson from Human Resources on May 18, 2006. (SOMF ¶¶ 78-79).

Management determined that copying and bringing the patient records to the May 18, 2006 meeting was a violation of the Health Insurance Portability and Accountability Act, better known as HIPAA. Pub. L. 104-191, 100 Stat. 1936. (SOMF ¶ 82).[6] Jerry West, the HHC official responsible for HIPAA compliance[7], was asked to review certain records which, according to Watson, were the ones Philson showed to management. (SOMF ¶ 87; West Dep., pp. 10, 15-16). There is a direct dispute as to whether or not the records were redacted. West testified that the documents were not blacked out and no information was torn off, and it was easy for him to identify

_____

[6]HIPAA includes provisions that mandate the adoption of federal privacy protections for individually identifiable health information. This information includes "[i]nformation that...(1) [i]s created or received by a health care provider...; and (2) [r]elates to the past, present, or future physical or mental health or condition of an individual;...and...[w]ith respect to which there is a reasonable basis to believe the information can be used to identify the individual." 45 C.F.R. § 160.103. The related Privacy Rule can be found at 45 C.F.R. §§ 160, 162, and 164.

[7]Philson has not challenged Jerry West's education or experience with regard to HIPAA.

which records belonged to what patient. (SOMF ¶¶ 91-93; West Dep., p. 10). Philson contends that the records were appropriately redacted. (Pl. Dep. Vol. I, pp. 98-100; Pl. Decl., ¶¶ 4, 9).[8]

After reviewing the documents, West concluded that none of the records belonged to any of Philson's patients. This indicated to him that she did not have a need to know what was in those records or a need to access them. (SOMF ¶ 95). According to West, "need to know" is a primary component of the HIPAA guidelines. (SOMF ¶ 97). West determined that Philson violated HIPAA by accessing the medical records and copying them without authorization and without a job-related need. (West Dep., pp. 13-15).

Philson subsequently received a Corrective Action/Disciplinary Report on May 25, 2006, which stated that her employment was being terminated for copying confidential patient records in violation of HIPAA, state and federal law, and the HHC confidentiality policy.[9]   (SOMF ¶ 98; Pl. Dep. Ex. D-88). Philson, McCarey, and Carriker all signed the notice on May 25, 2006. (SOMF ¶ 101). According to Philson, when she received the notice, she was told by McCarey that she could grieve the

---

[8]While certain medical records were reviewed during Philson's deposition, she has not identified any records as being the actual ones she presented to management during the May 18, 2006 meeting, and she has not submitted the records to the Court. What happened to the records is unclear.

[9]There is no dispute that Philson received the policy entitled "Confidentiality Statement Concerning the Use of Any Houston Healthcare Information" in September of 2005. This policy included a provision stating that unauthorized access to patient information could result in immediate termination. (SOMF ¶ 39; Pl. Dep. Ex. D-51).

matter, and a final decision on whether she would remain with the hospital would not be made until the grievance had been decided. (Pl. Decl., ¶ 21). The last day Philson worked at HHC was May 21, 2006. (SOMF ¶ 103).

In Philson's opinion, copying and providing the patient records was not wrong, because the patients were in her care and she thought her supervisors had a professional need to know what was happening on their ward. She and the supervisors had previously exchanged copies of similar patient assessments through interdisciplinary staff communications forms without any claims of a HIPAA violation. (Pl. Dep. Vol. II, p. 110; Pl. Decl., ¶¶ 7-8). Philson also believed she should not have been penalized when McCarey was not punished for showing her a nursing assessment, and she thinks she was treated differently because she is black. (Pl. Dep. Vol. II, pp. 94, 96).

Philson was advised of her appeal rights in the May 25, 2006 notice, and she submitted a handwritten "first appeal" request to Human Resources on that same day. (SOMF ¶¶ 104-105; Pl. Dep. Ex. D-93). Philson also sent two letters to Jeanne Hoag on May 25, 2006, stating that she had received "termination papers," that she believed the termination was based on "retaliation and discrimination," and that she was going through the appeal process. (SOMF ¶ 106; Pl. Dep. Ex. D-91 and D-92). She took yet another letter to Human Resources on May 26, 2006. (SOMF ¶ 107; Pl. Dep. Ex. D-94). Nevertheless, Philson did not believe she had been terminated on May 25 because she planned to grieve the matter, because the corrective action notice was not

11

signed by the Human Resource Manager, Leadership Group Member, or CEO, because of the length of time it took for HHC to act on her 2005 case, and because of what McCarey told her.  (Pl. Dep. Vol. II, p. 156; Pl. Decl., ¶ 21).

Several days after receiving the May 25th notice, Philson spoke with Ms. Cosby, who was HHC's Human Resources Director at the time.  Ms. Cosby informed Philson that no final decision about her termination had been made and that no decision would be made until the entire matter was investigated.  (Pl. Supp. Decl., ¶¶ 4-5).

Philson and Carriker met on June 7, 2006 to discuss her appeal.  (SOMF ¶ 108; Pl. Dep. Ex. D-98).   The termination was upheld.  (SOMF ¶ 109).   Philson then appealed to the next level, and submitted two documents dated June 23, 2006 to inform Human Resources of what happened, what she had done, and why she did it.  (SOMF ¶ 111; Pl. Dep. Ex. D-96 and D-97).  Neither document made any reference to sex discrimination.  Also on June 23, Philson, David Campbell, and Don Haines, a Human Resources official responsible for the appeal process and disciplinary actions, met regarding the second appeal.  (SOMF ¶ 113).  Philson again presented her version of what happened.  (SOMF ¶ 114).  Prior to this meeting, Campbell met with Jerry West, and West informed him that Philson's actions constituted a serious HIPAA violation.  In the past, such violations resulted in termination.  (SOMF ¶¶ 115, 118-119).  Based on his conversations with West and other HHC officials, as well as the information presented by Philson, Campbell denied Philson's appeal.  (SOMF ¶ 121, Pl. Dep. Ex. D-100).

On June 30, 2006, Philson notified Human Resources that she wished to appeal to the third and final level.  (SOMF ¶ 125).  Linda Watson, then the Interim Director of Human Resources, was the third-level appeal official.  Based on materials submitted by Philson, discussions with Campbell, and her own observations of the records presented during the May 18, 2006 meeting, Watson denied the appeal on July 10, 2006.  (SOMF ¶ 126; Pl. Dep. Ex. D-102).

On July 22, 2006, Philson sent a letter to the HHC Board of Directors alleging that Carriker discriminated and retaliated against her because he was angry she told management that 1 West was unsafe and that patients were in danger.  (SOMF ¶ 130; Pl. Dep. Ex. D-105 and D-106).  She also alleged that Carriker was treating her in this manner because Jeanne Hoag reinstated her in 2005.  (SOMF ¶ 131; Pl. Dep. Ex. D-105 and D-106).

Philson claimed in an August 7, 2006 letter to the Chairman of HHC that a white male nurse, Gary Walls, "took her job."  (SOMF ¶ 137; Pl. Dep. Ex. D-108).  The position for which Walls applied was posted on December 9, 2005.  A position at HHC cannot be posted if there is not a vacancy.  (Watson Decl., ¶ 15).  Walls applied on April 1, 2006.  The decision to extend an offer to Walls was made on May 10, 2006, and the offer was extended on May 18, 2006.  Walls' employment with HHC was effective June 12, 2006, after he completed orientation.  (SOMF ¶ 138).

On or about September 1, 2006, Philson received her final paycheck from the hospital, which was dated July 20, 2006.  It was at this point Philson believed she had been terminated.  (Pl. Decl., ¶¶ 20-21).

Philson alleges that during April and May, 2006, six Caucasian nurses in 1 West, Frances Bolen, Mary Brigmond, Debra Hudson, Kelly Crawford, Walter Schnedeker, and Ray Goodson, all used the unauthorized abbreviations and completed their nursing assessments in the same manner she did, but none of them were ever disciplined.  (Pl. Dep. Vol. I, pp. 90-91).  Brenda Frazier, an African-American nurse in 1 West, also had incomplete assessments.  (Pl. Dep. Vol. I, p. 94).  After Philson received her corrective action/termination notice, an audit was done on 1 West to see if other nurses were using improper abbreviations.  (SOMF ¶ 133).  Three of the four errors found in the audit had been made by Philson.  (Carriker Dep., pp. 33-34).  No audit was done to see if other nurses had incomplete nursing assessments.  (Carriker Dep., pp. 33-34).  The abbreviation error not made by Philson was by Mary Brigmond, a Caucasian nurse. Brigmond was not disciplined for the error.  (Carriker Dep., pp. 33-34; SOMF ¶ 136).

Philson submitted a Notice of Charge to the EEOC on December 18, 2006. (SOMF ¶ 141; Pl. Dep. Ex. D-121).  In the Notice, Philson listed "Discharge" as the action taken against her, and listed Race, Sex, and "Retaliation due to prior EEO Complaint" as the alleged discriminatory bases.  (SOMF ¶ 142; Pl. Dep. Ex. D-121). Philson acknowledges, however, that she did not file any EEOC complaint prior to December 18, 2006.  (SOMF ¶ 143).

14

In terms of discrimination, Philson contends that Caucasian nurses called in for sick leave like she did in May, 2005, but none of them were terminated over their requests like she was.  (Pl. Dep. Vol. III, p. 19).  Philson also contends that before she received the May 25, 2006 notice, Mary Kilgore and Kelly Crawford, both Caucasian nurses were offered full-time positions with HHC, while Brenda Frazier, an African-American nurse, was frozen out of the hiring process.  (Pl. Dep. Vol. I, pp. 108-109).  She also contends that the selection of McCarey as ward nurse in charge was the product of sex and race discrimination.  (Pl. Dep. Vol. III, p. 67).

On May 5, 2008, Philson filed suit against HHC in this Court alleging that her termination and the written warning were due to her race and sex and were done in retaliation for having made prior claims of discrimination, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e to e-17.

**II. ANALYSIS**

### A. Summary Judgment Standard

Summary judgment must be granted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material facts and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A genuine issue of material fact arises only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

When considering a motion for summary judgment, the Court must evaluate all of the evidence, together with any logical inferences, in the light most favorable to the nonmoving party.  Id. at 254-55.  The Court may not, however, make credibility determinations or weigh the evidence.  Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (internal quotation marks omitted).  If the moving party meets this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact, or that the nonmoving party is not entitled to a judgment as a matter of law.  Id. at 324-26.  This evidence must consist of more than mere conclusory allegations.  See Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir. 1991).  Under this scheme summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.

**B. Conclusions of Law**

16

### 1.   Timely Filing of EEOC Charge

HHC has first moved for summary judgment on Philson's Title VII claims on the ground that Philson failed to timely exhaust her available administrative remedies. Before filing suit under Title VII, a plaintiff must file a charge of discrimination with the EEOC within either 180 or 300 days "after the alleged unlawful employment practice occurred."  42 U.S.C. § 2000e-5(e)(1); Wilkerson v. Grinnell Corp., 270 F.3d 1314, 1317 (11th Cir. 2001).  The 300-day time period is utilized in those states that have entities with the authority to grant or seek relief with respect to unlawful employment practices and an employee files a grievance with that agency; in all other states, known as "nondeferral states," the charge must be filed within 180 days. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 109, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). Because Georgia is a nondeferral state, the 180-day time period applies.  Watson v. Blue Circle, Inc., 324 F.3d 1252, 1258 (11th Cir. 2003).  The time period commences when the plaintiff is informed of the adverse employment action.  Stewart v. Booker T. Washington Ins., 232 F.3d 844, 849 (11th Cir. 2000).

There is no dispute that on May 25, 2006, Philson received a Corrective Action/Disciplinary Report on which "Termination of Employment" was marked as the action.  Philson herself signed the notice.  If these were the only facts, Philson's EEOC charge, which was not filed until December 18, 2006, would be untimely.  However, as Philson testified in her deposition, and as she avers in the declaration attached to her response to HHC's Motion, she was told by McCarey, a supervisor, that she could

17

grieve the matter and a final decision about her employment would not be made until the grievance was considered and decided.  In addition, Philson was told by the then director of human resources that a final decision on the termination had not been made and one would not be made until the matter was investigated.

The 180-day charge filing period "does not run until the plaintiff is told that she is actually being terminated, not that she *might* be terminated *if* future contingencies occur."  Stewart, 232 F.3d at 849 (emphasis in original).  As stated by the Eleventh Circuit, the EEOC charge filing period does not begin until the employee receives "unequivocal notice of the adverse employment decision."  Grayson v. K Mart Corp., 79 F.3d 1086, 1100 n. 19 (11th Cir. 1996).  If Philson was told by both a supervisor and the human resources director after she received the May 25th notice that no final decision about her termination had been made, the Court cannot find that she had unequivocal notice of her termination on May 25, 2006.  Accepting Philson's deposition and declaration testimony as true, which the Court must on summary judgment, she did not receive unequivocal notice of her termination until September, 2006, when she received her final paycheck from HHC.

It is clear that Philson's testimony raises a genuine issue of material fact as to whether she received unequivocal notice of her termination more than 180 days prior to the filing of her charge of discrimination with the EEOC.  HHC is not entitled to summary judgment on the basis that the EEOC charge was untimely filed, but is entitled to summary judgment on Philson's substantive claims as discussed infra.

18

### 2.   Title VII Claims

### a. Disparate Treatment Claims

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  A Title VII plaintiff may attempt to show this discrimination through either direct or circumstantial evidence.  Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999).  Direct evidence of discrimination is evidence that "'if believed, proves [the] existence of [a] fact in issue without inference or presumption.'"  Id. (quoting Burrell v. Bd. of Trustees of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)) (alterations in original).  Direct evidence consists only of "'the most blatant remarks, whose intent could be nothing other than to discriminate' on the basis of some impermissible factor."  Id. (quoting Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989)).

In this case, Philson has produced no direct evidence, and therefore, she must establish her discrimination claims by relying on the framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Under this framework, a Title VII claimant must first establish a prima facie case of discrimination by showing that:  (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was replaced by a person outside her protected class or was treated less favorably than a similarly-situated individual outside her protected class; and (4) she was qualified to do the job.

19

Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1323 (11th Cir. 2006); Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ., 342 F.3d 1281, 1289 (11th Cir. 2003).

Once the plaintiff has established a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason ("LNR") for its employment action.[10] Burke-Fowler, 447 F.3d at 1323. If the defendant articulates an LNR, the burden shifts back to the plaintiff to show that the defendant's proffered reason for the adverse action is pretextual. Id.

**1.    Written Warning**

Philson first contends that the issuance of the May 1, 2006 written warning constituted discrimination against her based on her race and sex. HHC contends that even if it concedes that a similarly situated Caucasian employee was treated differently, Philson cannot recover on a discrimination claim as to the written warning because the warning was not an adverse employment action.

To prove an adverse employment action in a Title VII case, a plaintiff must show a "serious and material" change in the terms, conditions, or privileges of employment. Davis v. Town of Lake Park, Florida, 245 F.3d 1232, 1239 (11th Cir. 2001). The action must be materially adverse as viewed by a reasonable person in the circumstances. Id.

---

[10]The defendant's burden at this stage is a burden of production. *See* Jackson v. State of Ala. State Tenure Comm'n, 405 F.3d 1276, 1289 (11th Cir. 2005).

HHC argues that there was no serious and material change in the terms of Philson's employment as a result of the written warning, as she would have been eligible to receive bonus payments and any applicable cash awards after the expiration of the warning's 180-day effective period, assuming no other incidents occurred during that period of time.  In addition, Philson would not have qualified for a pay raise because she was already being paid slightly above the maximum hourly rate for her position.

Philson takes the position that the written warning was an adverse employment action because no evidence has been presented showing that the warning could not be considered in deciding whether to give a bonus after the 180-day period or that the warning would be removed from Philson's file after its expiration.  She also asserts that the warning affected a material condition of her employment, as it could be used as the basis for her subsequent termination.

The Court finds that the written warning was not an adverse employment action for purposes of a Title VII claim.  Philson has not shown that the warning resulted in a loss of pay, position, or benefits.  Under this circuit's law, "the asserted impact cannot be speculative and must at least have a tangible adverse effect on the plaintiff's employment."  Davis, 245 F.3d at 1239.  The arguments in Philson's brief are couched in speculative terms, such as her contention that the warning "could" be used in determining that she would not receive any bonuses.  Philson has not presented any evidence that the warning had an actual tangible adverse effect on her employment.

21

In <u>Akins v. Fulton County, Georgia</u>, 420 F.3d 1293, 1301-1302 (11th Cir. 2005), the Eleventh Circuit examined the issue of adverse employment actions in the context of a First Amendment retaliation claim.  The <u>Akins</u> plaintiffs alleged that they suffered unwarranted reprimands, a negative work evaluation, threat of job loss through dissolution of their division, threat of suspension without pay, exclusion from meetings, and removal of job duties.  The court held that when considered individually or collectively, these employment actions could not be considered adverse because they did not harm the plaintiffs.  <u>Id.</u>  If that collection of actions does not meet the definition of an adverse employment action, the Court cannot find that the written warning issued to Philson was an adverse employment action.[11]

HHC's Motion for Summary Judgment on Philson's claims for race and sex discrimination regarding the written warning is granted.

### 2.    Race and Sex Discrimination

Philson meets three of the four factors for establishing prima facie cases of race and sex discrimination.  She is an African-American female, she was terminated from her job, and it appears she was qualified to do the job.  The question is whether HHC

---

[11]*See also* <u>Clark v. Potter</u>, 232 Fed. Appx. 895, 897 (11th Cir. April 30, 2007) (unpublished).  There, the plaintiff relied on his employer's letter of warning for disrespecting a supervisor to establish an adverse employment action.  The letter had no effect on the plaintiff's employment.  The plaintiff admittedly did not lose pay or suffer a loss of grade or employment benefits as a result of the disciplinary action.  Further, the plaintiff did not allege that the letter had any other tangible job effects, nor was there any evidence of any effects. The Eleventh Circuit held that the letter of warning was not an adverse employment action. <u>Id.</u>

treated similarly situated Caucasian and male employees more favorably than she was treated.[12]  It is Philson's position that she was treated differently than McCarey and Carriker, both Caucasian males, as she was terminated for presenting redacted records during the May 18, 2006 meeting, but they suffered no consequences for showing her a patient nursing assessment.[13]

The Eleventh Circuit has stated that with regard to the "similarly situated" aspect of a prima facie discrimination case, a plaintiff must show that she and the non-minority employee with whom she seeks comparison are "similarly situated in all relevant aspects." Jones v. Bessemer Carraway Med. Ctr., 137 F.3d 1306, 1311 (11th Cir. 1998) (citing Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (per curiam)), *modified on other grounds*, 151 F.3d 1321 (11th Cir. 1998).

When Philson received her termination notice, one of her supervisors was McCarey, who in turn was supervised by Carriker.  "Employees in supervisory positions are generally deemed not to be similarly situated to lower level employees." Vasquez

---

[12]While a prima facie case may also be established by showing the plaintiff was replaced by a person outside of the plaintiff's protected class, there is no evidence that Philson was replaced by a Caucasian nurse.  While she contends that Gary Walls, a white nurse, "took" her job, the evidence is that he assumed a vacant position that was posted in December of 2005, which he applied for on April 1, 2006, prior to Philson receiving the written warning.  Because a position cannot be posted if there is not a vacancy, the position that was filled by Walls could not have been the one that was occupied by Philson.  Philson has presented no evidence to rebut this evidence.

[13]As the Court has determined that the written warning was not an adverse employment action, the analysis on the race and sex discrimination claims will be limited to Philson's termination.

v. County of Los Angeles, 349 F.3d 634, 641 (9th Cir. 2003); *see also* Jones v. Denver Post Corp., 203 F.3d 748, 753 (10th Cir. 2000); Ward v. Proctor & Gamble Paper Prods. Co., 111 F.3d 558, 561 (8th Cir. 1997).

In a 2007 decision, the Eleventh Circuit addressed a disparate treatment claim where the plaintiff was a bank teller supervisor and the proposed comparator was a bank teller. Mathis v. Wachovia Bank, 255 Fed. Appx. 425, 431 (11th Cir. November 14, 2007) (unpublished). The court found that "[b]ecause of this relevant difference in positions and duties, the two were not similarly situated in all relevant aspects." Id. Likewise, Philson, McCarey, and Carriker are not similarly situated comparators.

The failure to establish proper comparator evidence is not necessarily fatal, however. "The lack of a similarly situated comparator should not defeat [the plaintiff's] prima facie case when there is other sufficient circumstantial evidence of discriminatory intent." Hunter v. Mobis Alabama, LLC, 559 F.Supp.2d 1247, 1257 (M.D. Ala. 2008); Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) ("If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where *no other evidence of discrimination is present.*") In her declaration, Philson has identified a number of matters demonstrating discriminatory intent, including management giving additional staffing assistance to Caucasian nurses but denying Philson's request, Caucasian nurses, both female and male, using the "QD" abbreviation and not receiving written warnings, and Caucasian nurses, both female and male, not completing their nursing assessments and not receiving written warnings.  HHC

24

acknowledges that one female Caucasian nurse was found to have used the "QD" abbreviation, but she was not disciplined in any way.  Viewing the evidence in the light most favorable to Philson, the Court finds that she has identified minimally sufficient evidence of discriminatory intent, thus establishing a prima facie case of race discrimination.[14]

The burden now shifts to HHC to articulate an LNR for the termination.  HHC has produced evidence that Philson was terminated because of her violations of HIPAA and the HHC internal policy regarding patient privacy.  The Court finds that HHC has met its burden, especially since Philson does not even address the LNR issue, but moves directly to the issue of pretext.

In order to prove pretext, a plaintiff must show that the employer's offered reason was not the true reason for its decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  Jackson, 405 F.3d at 1289 (quotation omitted).  "Provided that the proffered reason is one that might

---

[14]The Court finds the Middle District of Florida's opinion in Murdick v. Catalina Marketing Corp., 496 F.Supp.2d 1337 (M.D. Fla. 2007), worth noting on the comparator issue.  There, the employer contended that the employee had no comparators, and without comparators, the employee could not make out a prima facie case for discrimination.  Based on the Holifield decision, the court determined that comparators were not a condition precedent for establishing a prima facie case of discrimination.  Since there was no absolute requirement that comparators be cited, the court found that the employer had not properly supported its motion for summary judgment on the issue of whether someone outside the protected class was treated differently.  The employee was therefore not required to show a comparator.  Id. at 1357.

motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason."  Chapman v. AI Transp., 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) (ADEA case).

HHC contends that it terminated Philson for copying patient records without authorization, in violation of HIPAA and the hospital's confidentiality policy.  In an attempt to show pretext, Philson points to the following:  (1) she had legitimate access to the patient records involved because she was the charge nurse on duty at night[15]; (2) she had a responsibility to report to and show her supervisors the unsatisfactory practices of the Caucasian nurses in the ward; (3) she had previously given similar copies of her patients' records to her supervisors in an attempt to show them how Caucasian nurses treated their patients, and did not receive any negative response to those actions; (4) when she initially showed the patient records in question to McCarey and Carriker, who were her supervisors, she was not told that she should not have made a copy of the records; (5) McCarey showed her a patient record with the exact same information, but was not disciplined; (6) Carriker's attempt to terminate her employment in 2005; and (7) the fact that Caucasian nurses, both male and female,

_____

[15]Philson alleges in her declaration that "at night the nurse on duty is required to review all patients' records to see if they meet with the required Hospital policy," and that she came across the patient records during her standard review.  (Pl. Decl. ¶ 8).  It is worth noting that no hospital policy to support the contention that Philson had a duty to review the records has been produced.

were not disciplined for their actions in using certain abbreviations and not completing nursing assessments.

The Sixth Circuit decided a case in 2008 that the Court finds instructive for purposes of this matter.  In <u>Allen v. Highlands Hospital Corp.</u>, 545 F.3d 387, the employee plaintiffs sued the employer hospital for age discrimination after they were both terminated for allegedly violating the hospital's confidentiality policy.  The hospital determined that the plaintiffs breached the confidentiality of one of its patients, the granddaughter of one of the plaintiffs, by permitting the removal of the girl's x-rays from the hospital without written authorization from the girl's mother.  <u>Id.</u> at 390.

The plaintiffs argued that they did not violate HIPAA and the hospital's privacy policy, as the hospital did not have a written policy regarding the procedures to be used for the release of medical records.  In other words, they contended that the proffered reason was pretextual because it had no basis in fact.  <u>Id.</u> at 397.  The Sixth Circuit acknowledged that the hospital had no policy to be followed in releasing medical records, but the plaintiffs also acknowledged that the hospital's employee manual identified the release of "unauthorized or confidential information about patients" as an offense for which an employee could be fired upon the first infraction, referred to as a Group I offense.  <u>Id.</u> at 397.

The hospital argued that in determining if the plaintiffs raised a genuine issue of material fact as to pretext, the court should consider not whether the plaintiffs actually breached patient confidentiality, but whether the hospital had an honestly held belief

27

that the plaintiffs committed a Group I offense.  Id. at 398.  The court agreed, and went

on to explain that

> the key inquiry in assessing whether an employer holds such
> an honest belief is whether the employer made a reasonably
> informed and considered decision before taking the
> complained-of action.  An employer has an honest belief in
> its rationale when it reasonably relied on the particularized
> facts that were before it at the time the decision was made.
> [W]e do not require that the decisional process used by the
> employer be optimal or that it left no stone unturned.

Id. at 398 (quoting Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 598-599 (6th

Cir. 2007) (citations and internal quotation marks omitted)).

Using that standard, the court found that the hospital held an honest belief that

the plaintiffs had violated patient confidentiality.  Importantly, the evidence showed that

the hospital engaged in a thorough investigation to determine whether the plaintiffs'

conduct was inappropriate.  All of the management officials involved in the investigation

agreed that a terminable offense occurred, and recommended termination.   The

plaintiffs did not produce any evidence indicating that the process the hospital used to

conduct the investigation was "irregular or idiosyncratic."  Id. at 398.  The fact that the

hospital "reasonably relied on the particularized facts that were before it" in deciding

to terminate the plaintiffs negated the plaintiffs' contention that the hospital's proffered

explanation was a pretext.  Id. at 398-399.  The court held that the plaintiffs did not

show "that the [h]ospital acted unreasonably or without an honest belief that patient

privacy-an issue that is of paramount concern to healthcare providers and specifically protected by HIPAA-had been violated," and rejected their claim of pretext. Id. at 399.

Philson admits that she did not tell anyone in management that she was going to copy the patient records and did not get permission from any of the patients to copy their records.  Once she presented the records to Watson, Carriker, and McCarey, Jerry West, HHC's HIPAA officer, reviewed records given to him by Watson, and determined, based on his expertise and training in HIPAA law, that Philson's actions violated HIPAA.  While there is a dispute between the parties as to whether the records were de-identified by Philson before she presented them to the committee, West testified that the records he reviewed were not redacted, meaning he could tell the patients to which the records belonged.  According to West, Philson's actions also violated HIPAA because there was no evidence that any of the records belonged to patients she took care of, which meant that she did not have a need to know what was in those records or a need to access them.  Further, there was no authorization, either from HHC or the patients, given to Philson to pull and copy the records.  The fact that mental health records were involved raised the level of concern.

The appropriate inquiry for this Court is not whether Philson was actually guilty of misconduct, but whether HHC in good faith believed she had done wrong and whether this belief was the reason for the termination.  *See* Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991).  "[A] plaintiff employee may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of

the employer's reason, as long as the reason is one that might motivate a reasonable employer." Roper v. Foley, 177 Fed. Appx. 40, 49 (11th Cir. April 18, 2006) (per curiam) (unpublished) (internal quotation marks omitted).  It is not for this Court to second-guess the investigation conducted by HHC.  *See* Rowell v. BellSouth Corp., 433 F.3d 794, 789 (11th Cir. 2005) ("It is by now axiomatic that [the court] cannot second-guess the business decisions of an employer.").  As the record stands, Philson has presented no evidence to create a genuine issue of fact as to whether HHC honestly believed her to have violated HIPAA and the confidentiality policy at the time of her dismissal.  There is certainly nothing in the record exposing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in HHC's proffered LNR "that a reasonable factfinder could find [it] unworthy of credence." Ledbetter v. Goodyear Tire & Rubber Co., Inc., 421 F.3d 1169, 1186 (11th Cir. 2005), *aff'd*, 127 S.Ct. 2162 (2007).  This means her showing of pretext is inadequate, warranting summary judgment in HHC's favor on the race and sex discrimination claims.

### 3.    Failure to promote

In her response to HHC's Motion, Philson raises for the first time what appears to be a failure to promote claim.  She contends that the pattern of sex and race discrimination against her continued when Carriker selected McCarey as ward nurse in charge.  According to Philson, McCarey had only worked at HHC a short period of time, while she had been in the ward for five to six years.

To prevail on a failure to promote claim, a plaintiff must show, among other things, that she "applied for the promotion." Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1089 (11th Cir. 2004). Philson has offered no evidence that she ever applied to become the ward nurse in charge, which is fatal to her claim. To the extent Philson raises a failure to promote claim, HHC is entitled to summary judgment on that claim.

### 4.    Retaliation

Philson also alleges that she received the written warning and was terminated in retaliation for complaining about racial discrimination and for alleging discrimination in the course of appealing her 2005 termination.

"It shall be an unlawful employment practice for an employer to discriminate against any of his employees...because [an employee] has opposed any practice made an unlawful employment practice by this subchapter, or because [an employee] has...participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). In the absence of direct evidence of retaliation, the McDonnell Douglas burden-shifting framework that is used to analyze disparate treatment claims is also used to analyze retaliation claims. The plaintiff must first establish a prima facie case of retaliation by showing that "(1) [s]he engaged in statutorily protected expression; (2) [s]he suffered an adverse employment action; and (3) there is some causal relation between the two events." Olmstead v. Taco Bell Corp., 141 F.3d 1457, 1460 (11th Cir. 1998). Once a prima facie case of retaliation is established, HHC "must proffer a legitimate, non-retaliatory reason for the adverse

employment action." Id.  Philson "bears the ultimate burden of proving by a preponderance of the evidence that the reason provided by [HHC] is a pretext for prohibited, retaliatory conduct." Id.

HHC does not dispute that Philson suffered an adverse employment action in 2006 when she was terminated, or that she was engaged in statutorily protected expression by alleging discrimination in the course of appealing her 2005 termination. What HHC does contest is that there was a causal relationship between the 2005 statutorily protected expression and the 2006 adverse employment action.  Philson argues that there was a continuing pattern of race and sex discrimination against her for a 24-month period, during which time she complained about the discrimination, and one could reasonably conclude that the 2006 termination was in retaliation for her past complaints.

Even assuming Philson can establish a prima facie case of retaliation, the Court finds that summary judgment is appropriate because Philson cannot show that HHC's LNR for her termination is pretext.  Philson attempts to show pretext the same ways she attempted to show pretext on her race and sex claims.  For the same reasons that this Court rejected her attempts to establish pretext for those claims, the Court finds that she has failed to introduce any evidence from which a jury could infer pretext for her retaliation claim.

**III.    CONCLUSION**

For the foregoing reasons, HHC's Motion for Summary Judgment (Doc. 14) is

**GRANTED**.

**SO ORDERED**, this the 10th day of August, 2009.

_s/   Hugh Lawson_

**HUGH LAWSON, SENIOR JUDGE**

mbh